

FILED

MAR 3 0 2015

Clerk, U.S. District Court
District Of Montana
Missoula

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | MJ 14-45-M-JCL |
| Plaintiff, | |
| vs. | FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| DAN CALVERT WALLEN, | |
| Defendant. | |

Defendant Dan Wallen stands charged by information with three counts of

unlawful taking of a threatened species, in violation of 16 U.S.C. § 1538(a)(1)(G)

and § 1540(b)(1) and 50 C.F.R. § 17.40(b)(1)(i)(A). The information alleges that

on or about May 27, 2014, Wallen shot three grizzly bears at his residence near

Bigfork, Montana. The Court conducted a bench trial on March 10, 2015. Based

on the evidence and testimony presented at trial, the Court enters the following

-1-

findings of fact and conclusions of law pursuant to Federal Rule of Criminal Procedure 23(c).

## I.    Findings of Fact

In April 2014, Montana's Department of Fish, Wildlife and Parks ("FWP") began receiving reports of a female grizzly bear and three adolescent grizzly bears frequenting residential areas in Ferndale, near Bigfork, Montana. By mid to late May 2014, the adult female grizzly had apparently left the area and all subsequent reports were of the three adolescent bears. Grizzly Bear Management Specialist Tim Manley ("Manley") testified that FWP received approximately a dozen reports regarding the grizzly bears that spring. The bears had become habituated to human food sources and were reportedly accessing bird feed, dog food, chicken feed, and unsecured garbage at various residential locations. In addition, there were multiple reports of the bears accessing chicken coops and killing chickens. FWP set up electric fences around chicken coops at eight different properties, and set several culvert traps in the area in an attempt to capture and relocate the bears.

On the morning of May 27, 2014, Defendant Dan Wallen ("Wallen") and his wife, Alison Wallen ("Alison"), woke to find that bears had accessed a chicken coop on their property during the night and killed several of their chickens. Wallen gathered the chicken carcasses, took them to the dump, and then went to

work for the day.

At around 6:30 p.m. that evening, Wallen and Alison were sitting outdoors on the deck of their house watching their two young sons (then ages 8 and 11), their teenage daughter A.B. (then age 16), and one of A.B.'s friends, playing baseball in the yard. While the children were playing, three bears approached the yard from the east on an easement road to a neighbor's property. As soon as the children noticed the bears, they ran to the deck and went inside the house. The bears ran directly to the chicken coop, which is located approximately 40 yards to the south of Wallen's house.[1] Some of the chickens escaped from the coop, and the bears began chasing them in the area around the coop and a nearby shed. Wallen got in his pickup truck and corralled the bears back along the easement road until they reached the edge of his neighbor's property to the east. In the meantime, Alison called and left a message on Manley's cell phone, reporting their encounter with the bears and asking for assistance.

When Wallen returned to the house, he and his family gathered on the deck. Approximately 10 to 15 minutes later, the bears came back down the easement road from the east for a second time and started chasing the chickens in the same

---

[1] An aerial photograph admitted into evidence as Defendant's exhibit 502 provides a visual depiction of Wallen's property and the surrounding area.

area around the coop and shed. Wallen got back into his pickup and once again corralled the bears along the easement road to the edge of his neighbor's property.

Not long after Wallen came back, he and his family could see all three bears a long distance away in a field. After watching the bears for awhile, Wallen retrieved a .22 caliber rifle from inside the house and escorted A.B.'s friend to his vehicle. Once A.B.'s friend had driven away, Wallen began cleaning up the chicken carcasses strewn about the yard as the remaining chickens wandered freely about.

Wallen has given three accounts of the events that followed, the first of which was the subject of trial testimony by FWP game warden Charles Bartos ("Bartos"). At around 10:00 p.m. on the night of May 27, 2014, Bartos received a call from Manley regarding a grizzly bear that had been shot and killed in the Ferndale area. Bartos responded to the scene and spoke with Wallen about the incident. Wallen explained that grizzly bears had been in his chicken coop more than once that day. He told Bartos that this particular bear came into the yard area while he was picking up chicken carcasses. Wallen said the bear approached from the highway to the west of the house, got into the chicken coop, and started eating chickens. Wallen stated that in an attempt to scare the bear away, he shot at it one time while it was in the chicken coop and again while it was walking away.

-4-

Wallen said he did not think he hit the bear, and so was surprised when a short time later his neighbor immediately to the south, Tom Clark ("Clark"), called him to say there was what appeared to be an injured bear lying down in the driveway between their two houses. Wallen and Clark went to take a closer look and saw that the bear could only lift its head and was unable to get up, at which point Clark shot and killed it. A necropsy showed what appeared to be two bullet holes in the bear's left hind quarter, entering towards the stomach area.

The next day, Bartos received another call from Manley who reported that a second grizzly bear had been found dead from a gunshot wound on the same property. Bartos responded to the scene, retrieved the bear, and advised Wallen that the United States Fish and Wildlife Service was taking over the investigation. Wallen then volunteered some additional information about what had happened the night before. He told Bartos that shortly before the single grizzly appeared, two other grizzlies came into the yard while he was picking up chicken carcasses, broke into the chicken coop, and killed a number of chickens. Wallen stated that he fired two shots at the two bears and they ran off. Approximately one week later, a third dead grizzly bear was found on neighboring property immediately to the east of Wallen's. The third grizzly was located approximately 50 yards from where the second dead bear had been found.

Wallen described his encounter with the bears again on May 29, 2014, while being interviewed at his home by U.S. Fish and Wildlife Service Special Agent Brian Lakes ("Lakes"). Wallen recounted the two times he corralled the bears with his pickup truck, and said he was in the yard gathering chicken carcasses when two grizzly bears crossed the highway to the west of the house and came running into the yard area from behind the detached garage heading for the chickens. Wallen explained that his family was outside in the basketball area near the deck, and indicated that he was standing in the driveway near his pickup, approximately 40 yards from the bears when they came into view. Wallen said it was scary knowing that his family was outside as the bears went after the chickens.

Wallen indicated that his rifle was on the toolbox of his pickup truck at the time, and said he fired several shots at the bears to scare them off. Wallen made clear that the bears were not in the chicken coop when he fired the shots, and instead placed them between a tree and a post just west of the chicken coop and south of the garage. Wallen told Lakes that the two bears ran away, and moments later the third bear came running in the same direction from behind the garage. Wallen, who was still in the driveway but closer to the house by now and believed his family was behind him, fired two shots at the bear. Wallen indicated that the

bear was in the same area between the tree and the post the first two bears had been in, and said the bear ran away after the second shot. By Wallen's estimate, Clark called him approximately ten minutes later to report the injured bear lying in the driveway. At this interview, Wallen also signed an affidavit stating that he was fearful for himself and his family.

Wallen provided a third account of the events that day when he testified in his own defense at the March 10, 2015, bench trial. Wallen again described corralling the bears twice with his pickup truck, and then watching the bears from a distance while they were in a neighboring field. Wallen testified that after he escorted A.B.'s friend to his car, he began cleaning up chicken carcasses in the driveway. Wallen stated that he was carrying his gun at this point, and the remaining live chickens were gathered around him. Wallen said the two bears came running from the west around the corner of the garage. Wallen testified that he was standing 15 feet away from the bears as they ran from behind the garage, and he felt as if they were running towards him. Wallen recalled firing two shots at the bears as he backpedaled towards the house. Wallen estimated that he was standing 15 feet from the bears when he fired the first shot, and that he took his second shot approximately 20 seconds later. Wallen testified that the bears veered away from him and disappeared down the easement road to the east. Wallen was

shaken by the encounter but decided to keep removing chicken carcasses in hopes they would not attract the bears again.

According to Wallen, the third grizzly bear came running from behind the garage less than a minute later. Wallen testified that the bear was 28 feet away from him when it rounded the corner of the garage and was moving erratically, running at full speed in different directions. Wallen fired two shots at the bear – one from an estimated distance of 28 feet, and the second from 33 feet. Wallen testified that after the first shot the bear kept running into the yard where the chickens were, but after the second shot it jumped and ran away down the easement road to the east.

Wallen described feeling threatened by all three bears due to their proximity during the encounter, and remembered physically shaking even after the bears were gone. Several minutes after the third bear ran off, Clark telephoned Wallen to tell him about the injured bear lying in the driveway.

A.B. also testified as to her recollection of the events that evening, including the moment when the two bears came running into the yard from behind the garage. She stated that Wallen was holding his gun and picking up chicken carcasses at the time, and the bears were about 15 feet away from him when she saw them come from behind the garage. A.B. testified that upon seeing the bears,

she was so terrified that she immediately turned away and ran into the house. She

testified she did not see what Wallen did at the point in time the bears appeared

from behind the garage. She estimated that it was a minute or so after she turned

and ran that she first heard a gunshot. While A.B. testified that she heard

gunshots, she did not see what happened at the time Wallen actually shot the

bears. By the time she looked out the window, the two bears were running away

on the easement road to the east.

A.B. testified that the third bear came running around the corner of the

garage about five minutes later, while her father was standing in the driveway near

his truck. She estimated that Wallen was standing approximately 30 to 40 feet

from the bear when he fired the first of two shots. A.B. recalled that after Wallen

fired the first shot, the bear began running around in all different directions,

sometimes toward the chickens, sometimes toward the easement road to the east,

and sometimes toward her father. A.B. said Wallen was standing at the bottom of

the stairs to the deck when he fired a second shot at the bear. She believed the

second shot hit the bear, because it jumped and then ran away down the easement

road.

The Court finds the clear inconsistencies between Wallen's trial testimony

and his prior statements to Bartos and Lakes severely undermines his credibility,

particularly considered in conjunction with A.B.'s testimony. Wallen has provided conflicting accounts of where the third grizzly bear was when he fired his weapon. On the night in question, Wallen told Bartos the bear was eating chickens in the chicken coop when he shot at it an attempt to scare it away. He told Bartos he fired a second shot at the bear as it was walking away. Wallen's statements that night are consistent with the results of the necropsy, which showed two bullet holes in the bear's left hind quarter. When Wallen spoke to Lakes two days later, he indicated he shot at the bear when it was between a tree and a post just west of the chicken coop and south of the garage, and said the bear turned and ran away after the second shot. Finally, at trial, Wallen testified that the bear rounded the corner of the garage and was running erratically in different directions when he fired the two shots. Wallen's trial testimony that the bear was running erratically around the yard area outside the chicken coop when he shot at it cannot be reconciled with what he told Bartos at the scene – that the bear was in the chicken coop eating chickens when he shot at it the first time, and walking away when he took a second shot.

Wallen has also given conflicting accounts of his final encounter with the first two grizzly bears. Wallen indicated to Lakes that he was 40 yards away from the two bears as they came running from behind the garage. He said they were

heading for the chickens, so he fired several shots at the bears to scare them off. As Wallen described it at trial, however, he was standing 15 feet away from the two bears when they appeared from behind the garage and felt as if they were running towards him. Wallen testified that he was standing 15 feet from the bears when he fired the first shot, and that he took his second shot approximately 20 seconds later. While A.B. corroborated Wallen's testimony that he was 15 feet away from the bears when they came running around the corner of the garage, she said a minute or so passed before she first heard a gunshot. A.B.'s recollection of the time that passed before the first gunshot cannot be reconciled with Wallen's testimony that he was standing just 15 feet away when they appeared from the behind the garage and that he fired two shots at them as they ran towards him. These discrepancies compel the Court to conclude that Wallen's trial testimony as it pertains to his claim that he acted in defense of himself or others is simply not credible.

The Court also finds it significant that when Wallen spoke to Bartos at the scene that night, he only mentioned shooting at the third grizzly. It was not until the next day, when Bartos told him that another dead bear had been found, that he mentioned also shooting at the two bears. This was a material omission, which the Court finds bears directly on Wallen's credibility.

## II.    Conclusions of Law

Wallen stands charged with three counts of unlawfully taking a threatened species in violation of 16 U.S.C. § 1538(a)(1)(G) and § 1540(b)(1).  To convict Wallen, the government must prove beyond a reasonable doubt for each offense charged that: (1) Wallen did knowingly take a bear; (2) the bear was a grizzly; (3) Wallen had no permit from the United States Fish and Wildlife Service to do so; and (4) Wallen did not act in self-defense or in the defense of others. *United States v. Clavette*, 135 F.3d 1308, 1311 (*citing* 50 C.F.R. § 17.40(b)(i)(B)).

The first three elements of each offense were not in dispute at trial, and the government met its burden of proving them beyond a reasonable doubt.  "The term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct."  16 U.S.C. § 1532(19).  As expected, the government proceeded at trial on the theory that Wallen shot the three grizzly bears.  The government established, and Wallen did not dispute, that he shot each of the three grizzly bears, and in doing so engaged in a "take."  The government also presented evidence that Wallen acted "knowingly."  A defendant acts "knowingly" if he is aware of the act and does not act through ignorance, mistake or accident.  Ninth Circuit Model Criminal Jury Instruction 5.6 (2010).  To establish that Wallen acted "knowingly," the government was only required to

-12-

prove that Wallen knowingly "shot an animal which turned out to be a grizzly bear," not that "he knew he was shooting a grizzly bear at the time he pulled the trigger." *United States v. Onge*, 676 F.Supp. 1044, 1045 (D. Mont. 1988). This means Wallen "could only claim accident or mistake if he did not intend to discharge his firearm, or the weapon malfunctioned, or similar circumstances occurred." *Onge*, 676 F.Supp. at 1045. Wallen did not claim accident or mistake, and the government presented evidence establishing that he acted "knowingly" when he discharged his firearm. The government also presented evidence, which Wallen did not dispute, establishing beyond a reasonable doubt that the bears were grizzlies and Wallen did not have a permit.

Thus, the only issue to be resolved based on the evidence presented at trial is whether Wallen acted in self-defense or in defense of his family when he shot the grizzly bears. "Once a defendant has introduced evidence of self-defense, the burden shifts to the government to disprove it beyond a reasonable doubt." *United States v. Keiser*, 57 F.3d 847, 851 n.4 (9th Cir. 1995). Wallen testified that he was afraid for his own safety and that of his family when he discharged his firearm at the bears. Because Wallen produced evidence that he acted in self-defense, the government bears the burden of disproving self-defense beyond a reasonable doubt. *Clavette*, 135 F.3d at 1311 (*citing United States v. Keiser*, 57 F.3d 847,

851 n.4 (9th Cir. 1995)).

It is a defense to prosecution under the Endangered Species Act "if the defendant committed the offense based on a good faith belief that he was acting to protect himself or herself, a member of his or her family, or any other individual, from bodily harm from any endangered or threatened species." 16 U.S.C. § 1540(b)(3). Any such good faith belief must be objectively reasonable. *See Keiser*, 57 F.3d at 847. The government thus bears the burden of proving beyond a reasonable doubt that Wallen did not have an objectively reasonable good faith belief that he was acting to protect himself or his family from bodily injury when he shot at each of the three grizzly bears.

The Court concludes the government satisfied this burden. As set forth above, Wallen gave materially conflicting versions of events and was not entirely forthcoming when he spoke Bartos on the night in question. The Court concludes based on the record as a whole, and the substantial inconsistencies in Wallen's stories and lack of credibility, that the government met its burden of proving beyond a reasonable doubt that Wallen did not have an objectively reasonable good faith belief that he was acting to protect himself or his family from bodily injury when he shot at the three grizzly bears.

**III. Conclusion**

-14-

For the reasons set forth above, the Court finds Wallen guilty on all three counts of unlawfully taking a threatened species in violation of 16 U.S.C. § 1538(a)(1)(G) and § 1540(b)(1) and 50 C.F.R. § 17.40(b)(1)(i)(A).

IT IS ORDERED that sentencing is set for May 12, 2015, at 1:30 p.m., at the Russell Smith Courthouse in Missoula.

DATED this 30th day of March, 2015

Jeremiah C. Lynch
United States Magistrate Judge