IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>DAN CALVERT WALLEN,<br><br>Defendant. | CR 15-11-M-JCL<br><br>FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW |

This matter comes before the Court on remand for further proceedings after a decision by the Ninth Circuit Court of Appeals vacating Defendant Dan Wallen's conviction and sentence for taking three grizzly bears in violation of the Endangered Species Act.

I.  **Procedural Background**

In December 2014, Wallen was charged by Information with three counts of unlawful taking of a threatened species in violation of 16 U.S.C. §§ 1538(a)(1)(G) 1540(b)(1) and 50 C.F.R. § 17.40(b)(1)(i)(A). Following a bench trial in March 2015, the Court found Wallen guilty on all three counts and sentenced him to a three-year term of probation. The terms of the sentence required Wallen to serve 60 days in pre-release center and pay $15,000 in restitution. Wallen appealed the judgment and conviction to the district court, which affirmed in full. Wallen then

appealed to the Ninth Circuit, which reversed on the ground that the Court erred by applying an objective standard to the self-defense element of the offense and remanded the case for further proceedings. *United States v. Wallen*, 874 F.3d 620 (9th Cir. 2017).

On remand, the parties agreed to submit the case for decision based on the factual record established at the bench trial in March 2015, subject to the submission of any additional evidence. (Doc. 48). The Court established a deadline for the submission of any additional evidence, and ordered the parties to brief the issue of how the self-defense standard articulated in Ninth Circuit's decision applies to the existing factual record. Neither party submitted any additional evidence, and the court-ordered briefing is now complete. Because the parties have agreed to submit this case for decision based on the factual record established at trial, the Court finds no basis for changing its original findings of fact. Accordingly, the following findings of fact are substantively identical to those set forth in the Findings and Recommendation entered by the Court on March 30, 2015.

**II.    Findings of Fact**

In April 2014, Montana's Department of Fish, Wildlife and Parks ("FWP") began receiving reports of a female grizzly bear and three adolescent grizzly bears frequenting residential areas in Ferndale, near Bigfork, Montana. By mid to late

May 2014, the adult female grizzly had apparently left the area and all subsequent reports were of the three adolescent bears. Grizzly Bear Management Specialist Tim Manley testified that FWP received approximately a dozen reports regarding the grizzly bears that spring. The bears had become habituated to human food sources and were reportedly accessing bird feed, dog food, chicken feed, and unsecured garbage at various residential locations. In addition, there were multiple reports of the bears accessing chicken coops and killing chickens. FWP set up electric fences around chicken coops at eight different properties, and set several culvert traps in the area in an attempt to capture and relocate the bears.

On the morning of May 27, 2014, Wallen and his wife, Alison, woke to find that bears had accessed a chicken coop on their property during the night and killed several of their chickens. Wallen gathered the chicken carcasses, took them to the dump, and then went to work for the day.

At around 6:30 p.m. that evening, Wallen and Alison were sitting outdoors on the deck of their house watching their two young sons (then ages 8 and 11), their teenage daughter A.B. (then age 16), and one of A.B.'s friends, playing baseball in the yard. While the children were playing, three bears approached the yard from the east on an easement road to a neighbor's property. As soon as the children noticed the bears, they ran to the deck and went inside the house. The bears ran directly to the chicken coop, which is located approximately 40 yards to

the south of Wallen's house. Some of the chickens escaped from the coop, and the bears began chasing them in the area around the coop and a nearby shed. Wallen got in his pickup truck and corralled the bears back along the easement road until they reached the edge of his neighbor's property to the east. In the meantime, Alison called and left a message on Manley's cell phone, reporting their encounter with the bears and asking for assistance.

When Wallen returned to the house, he and his family gathered on the deck. Approximately 10 to 15 minutes later, the bears came back down the easement road from the east for a second time and started chasing the chickens in the same area around the coop and shed. Wallen got back into his pickup and once again corralled the bears along the easement road to the edge of his neighbor's property.

Not long after Wallen came back, he and his family could see all three bears a long distance away in a field. After watching the bears for awhile, Wallen retrieved a .22 caliber rifle from inside the house and escorted A.B.'s friend to his vehicle. Once A.B.'s friend had driven away, Wallen began cleaning up the chicken carcasses strewn about the yard as the remaining chickens wandered freely about.

Wallen has given different accounts of the events that followed, the first of which was the subject of trial testimony by FWP game warden Charles Bartos. At around 10:00 p.m. on the night of May 27, 2014, Bartos received a call from

Manley regarding a grizzly bear that had been shot and killed in the Ferndale area. Bartos responded to the scene and spoke with Wallen about the incident. Wallen explained that grizzly bears had been in his chicken coop more than once that day. He told Bartos that this particular bear came into the yard area while he was picking up chicken carcasses. Wallen said the bear approached from the highway to the west of the house, got into the chicken coop, and started eating chickens. Wallen stated that in an attempt to scare the bear away, he shot at it one time while it was in the chicken coop and again while it was walking away. Wallen said he did not think he hit the bear, and so was surprised when a short time later his neighbor immediately to the south, Tom Clark, called him to say there was what appeared to be an injured bear lying down in the driveway between their two houses. Wallen and Clark went to take a closer look and saw that the bear could only lift its head and was unable to get up, at which point Clark shot and killed it. A necropsy showed what appeared to be two bullet holes in the bear's left hind quarter, entering towards the stomach area.

  The next day, Bartos received another call from Manley who reported that a second grizzly bear had been found dead from a gunshot wound on the same property. Bartos responded to the scene, retrieved the bear, and advised Wallen that the United States Fish and Wildlife Service was taking over the investigation. Wallen then volunteered some additional information about what had happened the

night before. He told Bartos that shortly before the single grizzly appeared, two other grizzlies came into the yard while he was picking up chicken carcasses, broke into the chicken coop, and killed a number of chickens. Wallen stated that he fired two shots at the two bears and they ran off. Approximately one week later, a third dead grizzly bear was found on neighboring property immediately to the east of Wallen's. The third grizzly was located approximately 50 yards from where the second dead bear had been found.

  Wallen described his encounter with the bears again on May 29, 2014, while being interviewed at his home by U.S. Fish and Wildlife Service Special Agent Brian Lakes. Wallen recounted the two times he corralled the bears with his pickup truck, and said he was in the yard gathering chicken carcasses when two grizzly bears crossed the highway to the west of the house and came running into the yard area from behind the detached garage heading for the chickens. Wallen explained that his family was outside in the basketball area near the deck, and indicated that he was standing in the driveway near his pickup, approximately 40 yards from the bears when they came into view. Wallen said it was scary knowing that his family was outside as the bears went after the chickens.

  Wallen indicated that his rifle was on the toolbox of his pickup truck at the time, and said he fired several shots at the bears to scare them off. Wallen made clear that the bears were not in the chicken coop when he fired the shots, and

instead placed them between a tree and a post just west of the chicken coop and south of the garage. Wallen told Lakes that the two bears ran away, and moments later the third bear came running in the same direction from behind the garage. Wallen, who was still in the driveway but closer to the house by now and believed his family was behind him, fired two shots at the bear. Wallen indicated that the bear was in the same area between the tree and the post the first two bears had been in, and said the bear ran away after the second shot. By Wallen's estimate, Clark called him approximately ten minutes later to report the injured bear lying in the driveway. At this interview, Wallen also signed an affidavit stating that he was fearful for himself and his family.

  Wallen provided a third account of the events that day when he testified in his own defense at the March 10, 2015, bench trial. Wallen again described corralling the bears twice with his pickup truck, and then watching the bears from a distance while they were in a neighboring field. Wallen testified that after he escorted A.B.'s friend to his car, he began cleaning up chicken carcasses in the driveway. Wallen stated that he was carrying his gun at this point, and the remaining live chickens were gathered around him. Wallen said the two bears came running from the west around the corner of the garage. Wallen testified that he was standing 15 feet away from the bears as they ran from behind the garage, and he felt as if they were running towards him. Wallen recalled firing two shots at

the bears as he backpedaled towards the house. Wallen estimated that he was standing 15 feet from the bears when he fired the first shot, and that he took his second shot approximately 20 seconds later. Wallen testified that the bears veered away from him and disappeared down the easement road to the east. Wallen was shaken by the encounter but decided to keep removing chicken carcasses in hopes they would not attract the bears again.

According to Wallen, the third grizzly bear came running from behind the garage less than a minute later. Wallen testified that the bear was 28 feet away from him when it rounded the corner of the garage and was moving erratically, running at full speed in different directions. Wallen fired two shots at the bear – one from an estimated distance of 28 feet, and the second from 33 feet. Wallen testified that after the first shot the bear kept running into the yard where the chickens were, but after the second shot it jumped and ran away down the easement road to the east.

Wallen described feeling threatened by all three bears due to their proximity during the encounter, and remembered physically shaking even after the bears were gone. Several minutes after the third bear ran off, Clark telephoned Wallen to tell him about the injured bear lying in the driveway.

A.B. also testified as to her recollection of the events that evening, including the moment when the two bears came running into the yard from behind the

garage. She stated that Wallen was holding his gun and picking up chicken carcasses at the time, and the bears were about 15 feet away from him when she saw them come from behind the garage. A.B. testified that upon seeing the bears, she was so terrified that she immediately turned away and ran into the house. She testified she did not see what Wallen did at the point in time the bears appeared from behind the garage. She estimated that it was a minute or so after she turned and ran that she first heard a gunshot. While A.B. testified that she heard gunshots, she did not see what happened at the time Wallen actually shot the bears. By the time she looked out the window, the two bears were running away on the easement road to the east.

    A.B. testified that the third bear came running around the corner of the garage about five minutes later, while her father was standing in the driveway near his truck. She estimated that Wallen was standing approximately 30 to 40 feet from the bear when he fired the first of two shots. A.B. recalled that after Wallen fired the first shot, the bear began running around in all different directions, sometimes toward the chickens, sometimes toward the easement road to the east, and sometimes toward her father. A.B. said Wallen was standing at the bottom of the stairs to the deck when he fired a second shot at the bear. She believed the second shot hit the bear, because it jumped and then ran away down the easement road.

Wallen has provided three conflicting accounts of where the third grizzly bear was when he fired his weapon. On the night in question, Wallen told Bartos the bear was eating chickens in the chicken coop when he shot at it an attempt to scare it away. He told Bartos he fired a second shot at the bear as it was walking away. Wallen's statements that night are consistent with the results of the necropsy, which showed two bullet holes in the bear's left hind quarter. When Wallen spoke to Lakes two days later, he indicated he shot at the bear when it was between a tree and a post just west of the chicken coop and south of the garage, and said the bear turned and ran away after the second shot. Finally, at trial, Wallen testified that the bear rounded the corner of the garage and was running erratically in different directions when he fired the two shots. Wallen's trial testimony that the bear was running erratically around the yard area outside the chicken coop when he shot at it cannot be reconciled with what he told Bartos at the scene – that the bear was in the chicken coop eating chickens when he shot at it the first time, and walking away when he took a second shot.

Wallen has also given conflicting accounts of his final encounter with the first two grizzly bears. Wallen indicated to Lakes that he was 40 yards away from the two bears as they came running from behind the garage. He said they were heading for the chickens, so he fired several shots at the bears to scare them off. As Wallen described it at trial, however, he was standing 15 feet away from the

two bears when they appeared from behind the garage and felt as if they were running towards him. Wallen testified that he was standing 15 feet from the bears when he fired the first shot, and that he took his second shot approximately 20 seconds later. While A.B. corroborated Wallen's testimony that he was 15 feet away from the bears when they came running around the corner of the garage, she said a minute or so passed before she first heard a gunshot. A.B.'s recollection of the time that passed before the first gunshot cannot be reconciled with Wallen's testimony that he was standing just 15 feet away when they appeared from the behind the garage and that he fired two shots at them as they ran towards him.

## II. Conclusions of Law

While the findings of fact set forth above are no different from those entered after the March 2015 bench trial, the Court must revisit its conclusions of law in light of the self-defense standard articulated on appeal by the Ninth Circuit. The government has the burden of proving beyond a reasonable doubt for each offense charged that (1) Wallen knowingly killed a bear; (2) the bear was a grizzly; and (3) Wallen did not act in self-defense or in the defense of others.[1] *United States v. Charette*, --- F.3d ---, 2018 WL 3117903 (9th Cir. 2018); *United*

---

[1] When this case was tried in March 2015, the Ninth Circuit had stated that to convict a defendant for knowingly taking a grizzly bear the government must also prove a fourth element – that the defendant did not have a permit from the United States Fish and Wildlife Service to kill the bear. See *United States v. Clavette*, 135 F.3d 1308, 1311 (1998). The Ninth Circuit reiterated the same four elements when

The first two elements of each offense are not in dispute, and the government met its burden of proving them beyond a reasonable doubt. The last element comes from 16 U.S.C. § 1540(b)(3), which provides that it is a defense to prosecution if the defendant committed the offense based on a "good faith belief" that he was acting to protect himself or others. The statute does not say whether this "good faith belief" must be objectively reasonable, and at trial the parties disputed whether a subjective or objective standard should apply. With no controlling case law on the issue, this Court applied an objective standard and required the government to prove that Wallen did not have an objectively reasonable good faith belief that he was acting to protect himself or others.

On appeal, the Ninth Circuit addressed the issue for the first time and held that the Endangered Species Act's good faith defense "is governed by a subjective, rather than an objective, standard, and is satisfied when a defendant actually, even if unreasonably, believes his actions are necessary to protect himself or others from perceived danger from a grizzly bear." *Wallen*, 874 F.3d at 623. While the Ninth Circuit expressly rejected the government's argument that "good faith belief"

---

remanding this case for further proceedings. *Wallen*, 874 F.3d at 627. After the parties briefed the issues on remand, the Ninth Circuit made clear in *Charette* that the existence of a valid permit is not an element of the offense, but rather an affirmative defense which the defendant bears the burden of proving. *Charette*, --- F.3d ---, 2018 WL 3117903 *4. Wallen does not dispute that he did not have a permit to kill the grizzly bears.

should be interpreted as having an "objective component," it nonetheless emphasized that "the objective reasonableness (or unreasonableness) of a claimed belief bears directly on whether the belief was held in good faith." *Wallen*, 874 F.3d at 631, 632. As the Ninth Circuit explained it, the factfinder may consider the objective reasonableness of the belief in weighing the credibility of the defendant's claim, but "may not substitute its own determination of objective reasonableness for what the defendant subjectively believed." *Wallen*, 874 F.3d at 632.

The Ninth Circuit remanded with instructions for this Court to "decide whether Wallen held a subjective good faith belief that he was acting to protect himself or a member of his family from bodily harm from the grizzly bears." *Wallen*, 874 F.3d at 634 (internal quotations and punctuation omitted). The Ninth Circuit made clear that "[i]n assessing the credibility of Wallen's claimed belief that shooting the bears was necessary," the Court "may consider any evidence that it would have been unreasonable to believe the bears posed a danger to Wallen or his family." *Wallen*, 874 F.3d at 634.

Applying this legal standard to the findings of fact set forth above, the Court concludes the government met its burden of establishing beyond a reasonable doubt that Wallen lacked a subjective belief he was in danger. As set forth above, Wallen gave three different accounts of the circumstances surrounding the deaths of the grizzly bears. The Court finds that the inconsistencies between those

accounts severely undermine his credibility. The Court also finds it significant that when Wallen spoke to Bartos at the scene that night, he only mentioned shooting at the third grizzly. It was not until the next day, when Bartos told him that another dead bear had been found, that he mentioned also shooting at the two bears. This was a material omission, which the Court finds bears directly on Wallen's credibility. Based on the inconsistencies between Wallen's trial testimony and his prior statements, as well as his lack of candor when he spoke with Bartos on the night in question, the Court does not find Wallen's claim that he was actually fearful and shot the bears in self-defense to be credible.

In attempt to bolster his claim of self-defense, Wallen points to evidence that community members and local wildlife management had problems with the bears, and many of his neighbors were afraid of the bears. But this evidence is not relevant to Wallen's credibility, which the Court finds lacking for other reasons. Wallen also relies on Alison's testimony that she and her family were all afraid of the bears. But Alison's testimony does not change the Court's assessment of Wallen's credibility, which is undermined by the fact that he provided inconsistent statements about the circumstances surrounding the shootings.

For the reasons set forth above, the Court concludes that Wallen's lack of credibility and inconsistent statements demonstrate that he did not in good faith believe shooting the bears was necessary to protect himself or his family.

## III. Conclusion

Accordingly, the Court finds Wallen guilty on all three counts of unlawfully taking a threatened species in violation of 16 U.S.C. § 1538(a)(1)(G) and § 1540(b)(1) and 50 C.F.R. § 17.40(b)(1)(i)(A).

IT IS ORDERED that sentencing is set for August 15, 2018, at 2:00 p.m. at the Russell Smith Courthouse in Missoula.

DATED this 10th day of July, 2018. .

_____
Jeremiah C. Lynch
United States Magistrate Judge